UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| CHRISTIE RANQUIST, ) | |
| ) | |
|       Plaintiff ) | |
| ) | |
| v. ) | No. 2:11-cv-387-DBH |
| ) | |
| M & M INDUSTRIES, INC., ) | |
| ) | |
|       Defendant ) | |

### RECOMMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW
### ON MOTION FOR DEFAULT JUDGMENT

Plaintiff Christie Ranquist moves pursuant to Federal Rule of Civil Procedure 55(b)(2) for a default judgment against defendant M & M Industries, Inc. ("M & M") as to both counts of her complaint, by which she seeks damages for unlawful sex discrimination in violation of the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4551 *et seq.* (Count I), and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (Count II). *See* Plaintiff's Motion for Entry of Default Judgment ("Default Judgment Motion") (Docket No. 7); Plaintiff's Complaint and Demand for Jury Trial ("Complaint") (Docket No. 1). For the reasons that follow, I recommend judgment in the amount of $96,942.82, plus back pay from March 1, 2012, through the date of judgment at the rate of $134.62 weekly and prejudgment interest.

### I.  Procedural Background

Ranquist requested, and Judge Hornby approved, the holding of a hearing to determine damages. *See* Default Judgment Motion at 1; Motion Requesting Referral of Case to Magistrate Judge Rich for Damages Hearing and Recommended Decision on the Issue of Damages ("Hearing Motion") (Docket No. 8); Order (Docket No. 9); *see also, e.g., KPS & Assocs., Inc. v. Designs by FMC, Inc.*, 318 F.3d 1, 19 (1st Cir. 2003) ("While a default . . . constitutes an

1

admission of liability, the quantum of damages remains to be established by proof unless the amount is susceptible of mathematical computation.") (citation and internal punctuation omitted); *In re Home Rests., Inc.*, 285 F.3d 111, 114 (1st Cir. 2002) ("A hearing may be required . . . to set damages when the amount is in dispute or is not ascertainable from the pleadings.").

Ranquist initially requested an evidentiary damages hearing with a jury, *see* Hearing Motion, but then withdrew her request for a jury, *see* Notice of Withdrawal of Jury Request (Docket No. 15). In a pre-hearing conference that I held with counsel on January 17, 2012, she requested that the scope of the hearing be broadened to encompass her motion for default judgment, rather than simply "damages," and I agreed that such an approach would be more efficient and preferable. *See* Report of Hearing and Order re: Scheduling ("Pre-Hearing Conference Report") (Docket No. 13) at 2. I directed that Ranquist set forth, in a pre-hearing memorandum, exactly what legal or equitable relief she continued to seek apart from attorney fees and costs. *See id.* at 3 n.1.[1]

In her pre-hearing memorandum, Ranquist identified the following as the relief that she seeks: (i) back pay of approximately $14,600, (ii) compensatory nonpecuniary damages in an amount to be determined by the court, (iii) punitive damages in an amount to be determined by the court, (iv) front pay in the amount of $6,750 per year for at least two years, and (v) interest. *See* Plaintiff's Pre-Trial Memorandum ("Pre-Trial Memo") (Docket No. 16) at 2-3.[2] She also seeks litigation fees and costs, which, in accordance with my recommendation during the pre-

---

[1] In her complaint, Ranquist requested, *inter alia*, a number of specific equitable remedies, including permanently enjoining M & M from engaging in discriminatory employment practices based on gender, requiring the president of M & M to mail a letter to all employees notifying them of the verdict against M & M, and requiring that M & M provide certain training to management-level employees. *See* Complaint at 6-7.
[2] In her pre-trial memorandum, Ranquist stated that she was not opposed to reinstatement in lieu of front pay, although she had certain reservations about that approach. *See* Pre-Trial Memo at 3. However, at hearing, her counsel made clear that she does not consider reinstatement feasible.

hearing conference, she indicates that she will address separately through a bill of costs and an attorney fee petition. *See id.* at 3; Pre-Hearing Conference Report at 3 n.1.

On March 1, 2012, following notice to M & M, I held a hearing at which Ranquist appeared, represented by counsel. M & M did not appear. Ranquist called two witnesses, herself and her mother, Linda Shanley, both of whom were credible. She offered one exhibit, which I admitted without objection. At the close of the evidence, Ranquist's counsel presented oral argument.

With the benefit of the testimony, exhibit, and oral argument offered at hearing, I recommend that the court adopt the following proposed findings of fact and conclusions of law and grant the Default Judgment Motion, awarding Ranquist damages of (i) $14,942.82 in back pay through the date of hearing, (ii) $25,000 in compensatory nonpecuniary damages, (iii) $50,000 in punitive damages, and (iv) $7,000 in front pay, for a total of $96,942.82, plus back pay accruing at $134.62 weekly from the date of hearing through the date of judgment and prejudgment interest on the awards of back pay and compensatory damages only.

## II.  Proposed Findings of Fact

1. M & M is a Massachusetts corporation engaged in commercial cleaning, with a principal place of business in Milton, Massachusetts. Complaint ¶ 2.[3]

2. Ranquist is a resident of Rockland, Maine. *Id*. ¶ 3.

3. In February 2008, Clean Images, Inc. ("Clean Images"), a commercial cleaning business, hired Ranquist to clean the UPS Rockland facility. *Id*. ¶ 14; Ranquist testimony

---

[3] The default of APS obliges the court to accept all well-pleaded allegations of Henderson's complaint as true. *See, e.g., Home Rests.*, 285 F.3d at 114.

("Ranquist Test."). She worked mornings five days a week, for a total of between 12 and 18 hours weekly. Ranquist Test.

4.    Ranquist typically cleaned the Rockland facility's offices and restrooms, while another employee typically cleaned the garages. Complaint ¶ 16. However, Ranquist was entirely capable of cleaning the garages and often did clean the garages, for example, when other employees called in sick or resigned. *Id*.

5.    After the resignation of one employee who cleaned the garages, Ranquist took that role on in addition to her office and restroom cleaning duties for nearly four months, during which time she received a bonus. *Id*. ¶ 17. There were no complaints about her cleaning. *Id*.

6.    Ranquist was a good worker and received bonuses and commendations for her work. *Id*. ¶ 15. She received compliments from the UPS staff, some of whom told her that they had never seen the place so clean before. Ranquist Test. Clean Images also spoke highly of Ranquist and gave her as many as three raises each year and bonuses at Christmas. *Id*.

7.    Ranquist's starting pay was $8.50 per hour. *Id*. In 2009, she earned a total of $6,731.75 from Clean Images. Plaintiff's Exh. 1. As of January 2010, she was earning $9.50 per hour, taking into account a raise or raises in 2009. Ranquist Test.

8.    Ranquist, who is a single mother of three boys, relied on her earnings to pay for necessities such as rent. *Id*.

9.    Ranquist liked her job very much. *Id*. The job's hours worked well for her, allowing her to be home when her two school-age sons returned from school. *Id*. Ranquist's mother, Linda Shanley, was able to watch Ranquist's children when Ranquist departed for work, see the two older children off to school, and continue watching Ranquist's youngest child until Ranquist returned home at about noon. *Id*.; Shanley testimony ("Shanley Test.").

10. In December 2009, M & M participated in a bidding process to acquire the job of cleaning certain UPS facilities across the nation, including the Rockland facility. Complaint ¶ 18.

11. On or about January 4, 2010, M & M was awarded the Rockland facility contract and purchased equipment to clean that facility from Clean Images. *Id*. ¶ 19. Ranquist received a letter from Clean Images informing her that M & M was taking over the contract but that she would still have a job. Ranquist Test. Ranquist expected to continue in her job and wanted to do so. *Id*.

12. At the time that M & M bid for the Rockland facility contract, Clean Images employed a male, Derrick Hyde, to clean the garages while Ranquist cleaned the offices and restrooms. Complaint ¶ 20. Hyde, a recent high school graduate, had begun work for Clean Images only about two weeks prior to the award of the bid to M & M. Ranquist Test. Ranquist had been training him how to do the job. *Id*.

13. Ranquist had extensive experience cleaning the garages, offices, and restrooms, while Hyde almost exclusively cleaned the garages. Complaint ¶ 21.

14. On or about January 5, 2010, Clodomiro Bautista, president of M & M, visited the Rockland facility. *Id*. ¶ 22. He introduced himself to Ranquist as the owner of M & M. Ranquist Test. Ranquist had never previously met or spoken with Bautista. *Id*. As Ranquist went about her duties, she saw Bautista speak with Hyde and demonstrate to him how to sweep the garages properly. *Id*.; Complaint ¶ 23.[4] Bautista kept looking at Ranquist in a way that she found strange and that caused her to be fearful that she might lose her job. Ranquist Test. Bautista then met with Ranquist and told her that, because she could not clean the garages, the

---

[4] Ranquist used the term "warehouse"; however, it is reasonably clear that she referred to the same building or buildings termed "garages" in the complaint.

job was not for her and was "a man's job." Ranquist Test.; Complaint ¶ 24.  Ranquist protested that she had cleaned the garages before and that it was no big deal.  Ranquist Test.  This fell on deaf ears: Bautista handed her $50 and told her that she was done.  *Id*.  Bautista told Ranquist that Hyde was the best person for the job and would take over her duties.  Complaint ¶¶ 25-26.

15.   Ranquist was very upset and began to cry.  Ranquist Test.  Kim Polky, a UPS employee who was standing nearby, also was upset that Ranquist, whom she had considered a good cleaner, had been let go.  *Id*.  When Ranquist returned home that day, Shanley observed her to be very upset, tearful, and angry.  Shanley Test.

16.   Ranquist became stressed, anxious, and depressed after Bautista refused to keep her on in her cleaning job.  Ranquist Test.; Shanley Test.  She was prescribed medication for depression, and then for anxiety.  Ranquist Test.  As a consequence of losing her job, she eventually had to sell some of her furniture and her car.  *Id*.  Her power was shut off for nonpayment, and she had to move from her apartment because she could not afford the rent.  *Id*.  She received unemployment compensation but also applied for welfare and food stamps.  *Id*.  She was embarrassed to use her food stamp card.  *Id*.

17.   Ranquist went without a car for approximately one year, until November 2011, when her parents bought her one.  *Id*.; Shanley Test.  During that interval, Ranquist, who lives on the outskirts of Rockland, frequently walked a mile and a half, even in the winter, to purchase groceries.  Ranquist Test.

18.   The lack of a car hampered Ranquist's job search efforts.  *Id*.  However, she has applied for work at a number of places, even though she harbors fears that she will be abruptly terminated again.  *Id*.  As of the time of the hearing, she had received no job offers.  *Id*.  She has found the process of seeking employment without success to be nerve-wracking.  *Id*.  Prior to

January 2010, she had worked since she was 17 years old. *Id*. She would prefer to be working. *Id*.

19. Shanley, who is very close to Ranquist and sees her almost daily, has noticed changes in her since January 2010, continuing through the time of the hearing. Shanley Test. Ranquist sleeps more, her weight has fluctuated, and she is less outgoing and sociable. *Id*.

20. Since Ranquist's separation from the Rockland facility, she has received numerous compliments about the quality of her work there and has heard numerous complaints about Hyde's work and his tardiness from other Rockland facility employees whom she continues to encounter in the community. Complaint ¶ 29.

21. As of January 2010, M & M had 15 or more employees. *Id*. ¶ 30.

### III. Proposed Conclusions of Law

1. Both Title VII and the MHRA prohibit employers from discriminating against an individual with respect to her employment on the basis of her sex. *See* 42 U.S.C. § 2000e-2(a)(1); 5 M.R.S.A. § 4572(1)(A). A Title VII sex discrimination claim may be proven with direct evidence of discrimination, such as "an admission by the employer that it explicitly took [sex] into account in reaching an employment decision[.]" *Smith v. F.W. Morse & Co.,* 76 F.3d 413, 421 (1st Cir. 1996). Such "smoking gun" evidence is rare, but sex discrimination may also be proven with circumstantial evidence. *Id.* An MHRA sex discrimination claim may be proven in the same fashion. *See, e.g., Doyle v. Department of Human Servs.*, 2003 ME 61, ¶ 14, 824 A.2d 48, 53-54 ("When a plaintiff lacks direct evidence that an employer's actions were motivated by discriminatory animus and relies instead on circumstantial evidence of discrimination, the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-05, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973), applies.") (footnote omitted).

2. Ranquist supplies direct evidence that M & M, the successor to Clean Images, declined to keep her on the job because of her sex. Bautista, the owner of M & M and the sole person who made the decision to retain Hyde but not Ranquist, made clear that he did so because he considered the cleaning job "a man's job." Underscoring that this was indeed Bautista's sole rationale, he chose to keep a recent high school graduate with less than two weeks' experience, who was being trained by Ranquist, over Ranquist, an experienced cleaner who had received compliments and bonuses attesting to her competence, and he was unwilling to reconsider when informed by Ranquist that she had, in fact, been doing the "man's job" for which he considered her unfit.

3. M & M accordingly is liable to Ranquist for unlawful sex discrimination in violation of both Title VII and the MHRA.

4. Ranquist bears the burden of proving her damages, but need not do so with mathematical certainty. *See, e.g., Cordeco Dev. Corp. v. Santiago Vasquez*, 539 F.2d 256, 262 (1st Cir. 1976) ("[W]hile a plaintiff need not demonstrate the amount of damage with mathematical precision, it must provide sufficient evidence to take the amount of damages out of the realm of speculation and conjecture."); *Warren v. United Parcel Serv., Inc.*, 495 F. Supp.2d 86, 87 (D. Me. 2007), *jdgt. entered*, 2007 WL 2137769 (D. Me. July 24, 2007), *aff'd*, 518 F.3d 93 (1st Cir. 2008) ("Under Maine law, the plaintiff has the burden to prove his damages, but need not prove them with absolute precision.") (quoting *Merrill Trust Co. v. Maine,* 417 A.2d 435, 440-41 (Me. 1980) ("the most intelligible and probable estimate which the nature of the case will permit"; "judgmental approximation")).

### A. Back Pay

5. Ranquist is entitled to back pay from the date of M & M's refusal to hire her, January 5, 2010, through the date of judgment. *See, e.g., Johnson v. Spencer Press of Me., Inc.*, 364 F.3d 368, 379 (1st Cir. 2004) (noting, in Title VII and MHRA case, "An award of back pay compensates plaintiffs for lost wages and benefits between the time of the discharge and the trial court judgment.").

6. Ranquist has proven her entitlement to back pay averaging $134.62 per week, based on her 2009 earnings of $6,730, adjusted to $7,000 annually to take into account a pay raise to $9.50 that she received sometime during 2009 and additional pay raises that she likely would have received had she remained employed at the Rockland facility. As of the hearing date, 111 weeks had elapsed since Bautista's refusal to hire her. Hence, as of that time, her back pay totaled $14,942.82.[5] Back pay will continue to accumulate at that weekly rate from the date of hearing through the date of judgment.[6]

7. No offset from back pay for failure to mitigate damages should be made. Although plaintiffs in employment discrimination cases have a duty "to exercise reasonable diligence in finding alternative suitable employment[,]" back pay is "a presumptive entitlement of a plaintiff who successfully prosecutes an employment discrimination case." *Id.* (citation and internal quotation marks omitted). "As long as the claimant has made some effort to secure other

---

[5] Although, in her pre-hearing memorandum, Ranquist requested a total of approximately $14,600 in back pay, *see* Pre-Hearing Memo at 2, her counsel stated at hearing that he had based his calculations on his client's total earnings in 2009, which did not sufficiently factor in the impact, going forward, of a raise or raises received partway through 2009 or of other raises that his client likely would have received based on her past wage history with Clean Images. He suggested a modest increase to $7,000 in annual earnings to account for the impact of raises. His point is well-taken, and I have adopted that number.

[6] Pursuant to 42 U.S.C. § 2000e-5(g)(1), "[b]ack pay liability shall not accrue from a date more than two years prior to the filing of a charge with the [Equal Employment Opportunity] Commission [('EEOC')]." Ranquist filed a charge of discrimination with the Maine Human Rights Commission ("MHRC") and the EEOC on or about March 30, 2010. *See* Complaint ¶ 7. Her request for back pay running from January 5, 2010, comports with this provision.

employment, the burden to prove failure to mitigate normally resides with the defendant-employer, which then must show that (i) though substantially equivalent jobs were available in the relevant geographic area, (ii) the claimant failed to use reasonable diligence to secure suitable employment." *Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 16 (1st Cir. 1999) (citations omitted). *See also Webber v. International Paper Co.*, 307 F. Supp.2d 119, 126 (D. Me. 2004) ("The burden is on the defendant to prove facts relating to the appropriate deductions from back pay.") (construing Maine law). Ranquist testified that she made attempts to secure other employment, and M & M has made no showing that those efforts were insufficiently diligent.

      8.     No offset from back pay for Ranquist's receipt of unemployment compensation, welfare, or food stamps should be made. The MHRA affords no judicial discretion to reduce back pay awards by amounts received from a collateral source. S*ee, e.g., id.* at 124-25 ("Under the collateral source rule, a plaintiff who has been compensated in whole or in part for his damages by a source independent of the tortfeasor is nevertheless entitled to a full recovery against the tortfeasor. . . . Under the Maine Human Rights Act, there is no judicial discretion to reduce a back pay award by amounts received from a collateral source.") (citations, internal quotation marks, and footnote omitted). Thus, even if the court retains discretion for purposes of Title VII to make such offsets, *see, e.g., Lussier v. Runyon*, 50 F.3d 1103, 1107 (1st Cir. 1995), it cannot do so with respect to the MHRA back pay award to which Ranquist is simultaneously entitled, *see Quint*, 172 F.3d at 16-17.

### B. Compensatory Nonpecuniary Damages

      9.     Title VII and the MHRA permit an award of compensatory damages for nonpecuniary harms such as pain and suffering and mental anguish. *See, e.g.*, 42 U.S.C. § 1981a(b)(3); 5 M.R.S.A. § 4613(2)(B)(8)(e); *Monteagudo v. Asociación de Empleados del*

*Estado Libre Asociado de P.R.*, 554 F.3d 164, 175 n.12 (1st Cir. 2009) (nonpecuniary harms for which Title VII plaintiffs have recovered damages include humiliation, damage to reputation, and mental anguish manifested as insomnia, anxiety, guilt, and depression). Such damages are intended to make victims of intentional discrimination whole. *See, e.g., King v. McMillan,* 594 F.3d 301, 314 (4th Cir. 2010) ("The purpose of compensatory damages is to make the injured plaintiff whole for losses actually suffered[.]")

10. Ranquist suffered emotional distress, humiliation, anxiety, depression, and loss of enjoyment of life as a result of M & M's unlawful discrimination. As her counsel argued, Ranquist was a vulnerable person living on the edge, a single mother supporting three sons on a meager income. The loss of that income, and the discriminatory manner in which it was lost, precipitated a host of negative consequences. Ranquist endured a number of deprivations and hardships, including the loss of her car, as a result of which she had to walk a mile and a half to the store in winter, the shutoff of her power, and eventually the loss of her apartment. She suffered the humiliation, after having worked since she was 17, of applying for welfare and food stamps and having to use food stamps. She became sufficiently depressed and anxious to require medication and became more withdrawn and less outgoing. She slept more, and her weight fluctuated. She continues to harbor fear that what happened in January 2010 will happen to her again. As just compensation for these harms, all of which flow from M & M's unlawful discrimination, Ranquist is entitled to an award of $25,000.

### C. Punitive Damages

11. Title VII and the MHRA permit an award of punitive damages if the complaining party demonstrates that the respondent engaged in discriminatory practice(s) with malice or with reckless indifference to the rights of an aggrieved individual protected by Title VII or the

11

MHRA. *See* 42 U.S.C. § 1981a(b)(1); 5 M.R.S.A. § 4613(2)(B)(8)(c). For purposes of Title VII, this must be proved by a preponderance of the evidence; for purposes of the MHRA, it must be proved by clear and convincing evidence. *See Batchelder v. Realty Res. Hospitality, LLC*, 2007 ME 17, ¶¶ 21-22, 914 A.2d 1116, 1124.[7]

12. Ranquist's evidence meets either standard. As her counsel argued, this is an egregious case of overt sex discrimination. Bautista, the owner of M & M, declined to retain Ranquist as a cleaner on January 5, 2010, solely because she was a woman. He made no inquiry into her relative merits *versus* those of Hyde. Had he done so, he would have learned that Ranquist had cleaned the Rockland facility for two years, had received numerous compliments and raises, had covered for other workers, and had competently cleaned all areas of the UPS Rockland facility, including the garages/warehouse, while Hyde, a recent high school graduate, had been employed for only two weeks and was in the process of being trained by Ranquist. Bautista offered one explanation to Ranquist for her unexpected dismissal: that cleaning the garages was a "man's job." When she protested that she could, in fact, clean the garages, he would not reconsider. He further humiliated her by handing her $50, telling her that she was done, and, in her presence and that of at least one UPS employee, hiring Hyde to do her job. There can be no doubt that, in discharging Ranquist, Bautista did so with malice or reckless indifference to her right to be free from discrimination based on her sex.

13. Punitive damages serve "a broader function" than compensatory damages: "they are aimed at deterrence and retribution." *State Farm. Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). *See also King*, 594 F.3d at 314 ("[P]unitive damages serve to punish the

---

[7] A defendant's default does not prevent an award of punitive damages. *See, e.g., McKinnon v. Kwong Wah Rest.*, 83 F.3d 498, 508-09 (1st Cir. 1996) (remanding Title VII default judgment case for further clarification and explanation of denial of punitive damages award).

defendant for malicious conduct or to display to others an example of the consequences they may expect if they engage in similar conduct.") (citation and internal quotation marks omitted). Given the reprehensibility of the conduct at issue, engaged in not by a low-level employee but by the purported "owner" of M & M, the severe emotional as well as financial harm inflicted on Ranquist, the blatancy of M & M's disregard of longstanding federal and Maine law proscribing employers from discriminating on the basis of sex, and the resulting need to deter M & M from engaging in such conduct in the future, *see Romano v. U-Haul Int'l*, 233 F.3d 655, 673-74 (1st Cir. 2000) (listing factors relevant to award of punitive damages in Title VII sex discrimination case), I conclude that an award of $50,000 in punitive damages is warranted.[8]

### D. Front Pay

14. Ranquist also demonstrates her entitlement to front pay. "Front pay . . . is money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement." *Johnson*, 364 F.3d at 379 (citations and internal quotation marks omitted). While reinstatement is preferred, *see, e.g., Webber*, 307 F. Supp.2d at 128, "where reinstatement is not feasible, the Court has discretion to award a successful plaintiff front pay from the date of judgment forward[,]" *id.* at 129. "The burden falls on the plaintiff to prove the amount, if any, of a front pay award." *Id.* (citation and internal punctuation omitted).

15. "Maine's rule mirrors the federal standard that front pay should not be awarded unless reinstatement is impracticable or impossible." *Thayer v. Eastern Me. Med. Ctr.*, 702 F. Supp.2d 17, 18 (D. Me. 2010) (citations and internal quotation marks omitted). "As to the

---

[8] This proposed award falls well within the ratio of punitive to compensatory damages that the Supreme Court has indicated comports with a defendant's due process rights. *See Campbell*, 538 U.S. at 425 (declining to impose "bright-line ratio" but noting that, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process").

impossibility and impracticality of reinstatement, the Supreme Court has explained that reinstatement is not viable if there is continuing hostility between the plaintiff and the employer or its workers or if the plaintiff has suffered psychological injuries as a result of the discrimination." *Id*. at 18-19 (citation and internal quotation marks omitted).

16. The plaintiff demonstrates that, in view of the egregious nature of the sex discrimination to which she was subjected, the emotional harm that she suffered as a result, and M & M's failure to participate in the instant suit, reinstatement is impracticable. However, she offers no basis on which to believe that her job search efforts will prove unavailing for as much as an additional two years postjudgment, particularly in view of her testimony that she would prefer to work and that she has been able to expand the scope of her search after being provided with a car by her parents in November 2011. I determine that an award of one year's front pay, or $7,000, suffices to make her whole.

### E. Prejudgment Interest

17. "[T]he assessment of prejudgment interest serves two purposes in the ordinary civil context: first, it compensates an injured party for the inability to use money rightfully belonging to that party between the date suit is filed and the date judgment is entered, and second, it encourages the defendant to conclude a pretrial settlement of clearly meritorious suits." *Guiggey v. Great N. Paper, Inc.,* 1997 ME 232, ¶ 7, 704 A.2d 375, 377 (citations and internal punctuation omitted).

18. "Under federal law, the award of prejudgment interest and the appropriate rate, if not prescribed by the statute providing the plaintiff's recovery, are discretionary decisions for the judge." *Tobin v. Liberty Mut. Ins. Co*., 553 F.3d 121, 146 n.37 (1st Cir. 2009). "If the particular federal statute is silent, courts have discretion to select an appropriate rate, and they may look to

outside sources, including state law, for guidance." *Id*. (citation and internal punctuation omitted). Title VII neither mandates an award of prejudgment interest nor prescribes a rate for any such award. *See, e.g., Earnhardt v. Commonwealth of P.R.*, 744 F.2d 1, 3 (1st Cir. 1984) (court retained discretion whether to award prejudgment interest in Title VII case). By contrast, pursuant to Maine law, "prejudgment interest is allowed at the one-year United States Treasury bill rate plus 3%." 14 M.R.S.A. § 1602-B(3); *see also, e.g.*, *Rooney v. Sprague Energy Corp.*, No. CV-06-20-B-W, 2008 WL 4550543, at \*1-\*2 (D. Me. Oct. 9, 2008) (plaintiff who prevailed on MHRA claim was entitled to an award of prejudgment interest pursuant to 14 M.R.S.A. § 1602-B(3), unless barred by another provision of Maine law). To the extent that it is necessary to consider whether an award of prejudgment interest is appropriate on the parallel Title VII claim, I recommend that the court look to state law, reaching the same result.

19. For purposes of subsection 1602-B(3), "'one-year United States Treasury bill rate' means the weekly average one-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the last full week of the calendar year immediately prior to the year in which prejudgment interest begins to accrue." 14 M.R.S.A. § 1602-B(3)(A).

20. "Prejudgment interest accrues from the time of notice of claim setting forth under oath the cause of action, served personally or by registered or certified mail upon the defendant until the date on which an order of judgment is entered." *Id*. § 1602-B(5). "If a notice of claim has not been given to the defendant, prejudgment interest accrues from the date on which the complaint is filed." *Id*. Ranquist's filing on March 30, 2010, of a Charge of Discrimination with the MHRC and the EEOC arguably served as a "notice of claim" for these purposes, *see, e.g., Warren*, 495 F. Supp.2d at 90; *Currier v. United Techs. Corp.*, 326 F. Supp.2d 145, 159-60 &

15

n.11 (D. Me. 2004); however, she has not (i) made that argument or (ii) alleged in her complaint, or otherwise adduced evidence, that her Charge of Discrimination was made under oath or served personally or by registered or certified mail upon the defendant, as required by 14 M.R.S.A. § 1602-B(5). Hence, interest should begin to accrue as of the time of the filing of the instant complaint on October 14, 2011. Provisions for (i) the suspension of the accrual of interest during a continuance of more than 30 days requested by the prevailing party and (ii) a full or partial waiver of interest on petition of the nonprevailing party and on a showing of good cause, *see* 14 M.R.S.A. § 1602-B(5), are inapplicable in this case.

21. An award of prejudgment interest is appropriate with respect to back pay and compensatory damages only. *See Scarfo v. Cabletron Sys., Inc.*, 54 F.3d 931, 961 (1st Cir. 1995) ("Interest is ordinarily awarded to compensate for the lost use of funds. Since the front pay awards represent damages for wages the plaintiffs would have received in the future, after the date of judgment, the plaintiffs had not lost use of these funds before the judgment was ordered."); *Morin v. Eastern Me. Med. Ctr.*, 806 F. Supp.2d 280, 285 (D. Me. 2011) (prejudgment interest is not available on punitive damages).

## IV. Conclusion

For the foregoing reasons, I recommend that the court **GRANT** the Default Judgment Motion and, consistent with the foregoing, enter judgment in favor of Ranquist and against M & M on Counts I and II of her complaint in the amounts of (i) $14,942.82 in back pay through the date of hearing, (ii) $25,000 in compensatory nonpecuniary damages, (iii) $50,000 in punitive damages, and (iv) $7,000 in front pay, for a total award of $96,942.82, plus back pay accruing at $134.62

weekly from the date of hearing through the date of judgment and prejudgment interest pursuant to 14 M.R.S.A. § 1602-B on the back pay and compensatory nonpecuniary damages awards only.[9]

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 2nd day of May, 2012.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge

---

[9] Pursuant to applicable federal and Maine law, the combined sum of compensatory and punitive damage awards is capped at amounts ranging from $50,000 to $300,000 depending on the number of individuals employed by a defendant employer. *See* 42 U.S.C. § 1981a(b)(3); 5 M.R.S.A. § 4613(2)(B)(8)(e). Back pay, front pay, and prejudgment interest on back pay do not constitute "compensatory damages" for purposes of the caps. *See, e.g.*, 42 U.S.C. § 1981a(b)(2); 5 M.R.S.A. § 4613(2)(B)(8)(d); *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 848 (2001). Prejudgment interest on compensatory damages is subject to the caps, *see, e.g., Rooney*, 2008 WL 4550543, at *2 (construing Maine law); however, even without taking that into account, my recommended combined award of $75,000 in compensatory and punitive damages exceeds the lowest possible cap of $50,000 for defendants who have more than 14 and fewer than 101 employees. *See* 42 U.S.C. § 1981a(b)(3)(A); 5 M.R.S.A. § 4613(2)(B)(8)(e)(i). Nonetheless, at hearing, the plaintiff's counsel correctly noted that, for Title VII purposes, the defendant employer bears the burden of establishing its entitlement to a damages cap. *See Hernández-Miranda v. Empresas Díaz Massó, Inc.*, 651 F.3d 167, 176 (1st Cir. 2011) ("The applicability of the caps is not an element of the Title VII claim. Instead, the defendant employer must affirmatively move to impose the cap and to present relevant evidence."). By virtue of its default, M & M has failed to carry its burden of proving that any particular cap applies.